Filed 8/6/26  P. v. Negrete CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ISAIAH DAVID RIVERA NEGRETE,<br><br>Defendant and Appellant. | F090518<br><br>(Super. Ct. No. CR-24-013167)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Franson, J. and Harrell, J.

## INTRODUCTION

Appellant and defendant Isaiah David Rivera Negrete (appellant) was convicted of multiple offenses for assaulting a woman whom he was dating, and then resisting arrest. He was sentenced to an aggregate term of eight years four months in this case and an unrelated case where his probation was revoked.

On appeal, appellate counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) Appellant did not file a supplemental brief on his own behalf. We affirm.

## FACTS

M.N. testified she met appellant in October 2023, and they started dating. Appellant and M.N. became involved in a romantic relationship, and she described herself as appellant's fiancée. M.N. knew appellant had two young children with another woman, A.R. On February 1, 2024, M.N. and appellant started living together. On August 29, 2024, M.N. moved out. Appellant and M.N. did not have any children.

After they split up, M.N. still regularly maintained contact with appellant through text messages and telephone calls. M.N. testified appellant was always jealous that she might be seeing someone else.

Appellant was charged with committing offenses against M.N. on September 22 and October 12, 2024.

### Incident on September 22, 2024

M.N. testified that on September 22, 2024, she went to a relative's baby shower. She told appellant about the event, and she agreed to meet him at a sushi restaurant after it was over.

Around 5:30 p.m., M.N. left the baby shower and texted appellant that she was heading to the sushi restaurant. When she arrived, appellant was alone and drinking an

2.

alcoholic beverage known as a "sake bomb." Appellant said he had been there for two hours with a cousin, who had left. M.N. drank three sake bombs with appellant.

After about two hours, appellant and M.N. left the sushi restaurant and drove in their separate vehicles to appellant's residence. Appellant and M.N. were together on a mattress for a while and then decided to go to another restaurant for a drink.

Appellant and M.N. left appellant's house for the restaurant, and M.N. said she would drive. M.N. had placed flowers and leftover food from the baby shower on the front passenger seat. When appellant opened the passenger door, he tried to move everything, but the food fell out of the car and landed on the ground. Appellant picked up the food and said they could still eat it. M.N. disagreed, and they started arguing about whether the food was edible.

M.N. drove to the restaurant but they continued to argue, and she decided to turn around. M.N. drove back to appellant's residence and parked in front. M.N. told appellant to get out of her car because he was drunk. Appellant tore up the flowers and threw them at her.

Appellant stayed in the car and said they should still go to the restaurant. Around 10:00 p.m. (RT 105), M.N. started driving again, but parked at a bowling alley near the residence of appellant's cousin. M.N. thought the cousin might help get appellant out of her car.

M.N. told appellant to get out. Appellant stayed in the car, and cursed and yelled at her. Appellant threw his cellphone at the windshield, which cracked the glass, and then he picked up his cell phone.

Appellant climbed on top of M.N. in the driver's seat so that he faced the backseat. He grabbed M.N.'s hair, slammed her head back into the driver's seat headrest more than five times, and slapped her. Appellant spit on M.N. and said, "You're lucky I don't f[***]ing kill you right here."

Appellant moved the driver's seat backwards for more room and turned around to face the front of her car. He started M.N.'s car and sat on top of her while he drove toward his house. Appellant's cell phone fell out of his pocket, and M.N. grabbed it and threw it out the car window. Appellant turned the car around and drove back to find his cell phone. When appellant got out of the car to look for it, M.N. regained control of her car and drove away.

As a result of appellant's assault, M.N. had marks on her chest and neck, and some of her hair fell out.

**Incident on October 12, 2024**

M.N. testified that at some point after the September 22, 2024, incident, she exchanged messages with appellant, forgave him, and they made up. She sent a photograph of her car's damaged windshield to appellant so he could see what he did. Appellant told her to relax.

M.N. resumed her relationship with appellant. They spent weekends together, they were happy, and they had consensual sex. Appellant "reproposed" and "gave me back my engagement ring back."

M.N. testified that on October 12, 2024, she went to her cousin's house. She had invited appellant to join her, but he did not show up. Appellant sent a text message while she was there, told her to hurry up, and asked if she was really at a relative's house. She agreed to meet him later.

M.N. left her cousin's house and informed appellant she was on her way, but he said it was too late. M.N. went home and they again communicated, and she drove to his house around 10:00 p.m.

Appellant and M.N. sat around and talked for about 40 minutes. M.N. had a "shot." She did not know if appellant had been drinking but she saw liquor in the kitchen. They eventually went to his bedroom, and he performed oral sex on her. M.N. testified appellant aggressively bit her vagina twice, and he claimed it was because M.N.

4.

offended him. Appellant threw her off the bed and spit in her face. He slapped her about five times and used increasing amounts of force with each blow. Appellant yelled and cursed at her, grabbed her hair, and threw her back on the bed. Appellant said he was going to drag M.N. by her "beautiful black hair," grabbed her hair and twirled it with his hand, and dragged her about 35 feet toward the front door.

M.N. said she was going home. Appellant refused to let her leave. M.N.'s cell phone was near her, and she called out for "Siri" to call 911. Appellant became angry and took M.N.'s cell phone and put it in the living room along with his own cell phone. Appellant took M.N. back to the bedroom, called her a "f[***]ing b[****]," a snitch, and a rat. He straddled M.N.'s body, put his hands around her neck, and choked her. He kept telling M.N., "Look what you made me do."

M.N. was not sure if appellant had retrieved his cell phone, but he acted like he called A.R., his children's mother, while he was on top of M.N. and squeezing her neck. Appellant acted like he was talking to A.R. and said, "[T]his stupid b[****] is here," and "I'm going to let you f[***] her up then I'm [going] to f[***] her up. I'm going to let her scratch me—I'm going to let you scratch me and then kill her," and he would "act like it was self-defense; she caught us f[***]ing in the bed."

M.N. was scared because he had "already planned to kill me before." M.N. again tried to leave and appellant held onto her. Appellant said she was going to stay at least three days until her bruises faded.

Appellant physically held onto her the rest of the night. Around 7:00 a.m., M.N. was able to get away while he was asleep. She got in her car and drove back to her residence.

### *M.N. Calls the Police*

M.N. testified that after the October 12, 2024, incident, she had bruises all over her body, cuts and marks on her face and neck, and her tongue was swollen. She was missing hair and had a bald spot. She went to a doctor and received medication for pain

and headaches. She also had to miss work for a couple of weeks because of the pain. Sometime after the incident, she saw appellant on her doorbell camera.

On October 15, 2024, M.N. saw appellant driving around with his children and their mother. On the same day, M.N. called the police because her friends encouraged her to make the call, and her bruises were getting worse.

Modesto Police Officer Blum responded to M.N.'s house, interviewed her, and took photographs of her injuries. Blum determined M.N.'s injuries did not result from consensual sex. After she spoke to the officer, M.N. contacted appellant and told him that he was going to be arrested.

### *Arrest of Appellant*

At 8:30 p.m. on October 15, 2026, Officers Blum, Ureno, Thomas, and Lepe met about a block away from appellant's residence to form a plan to arrest him. The officers were wearing marked uniforms and body cameras. They were concerned because of the nature of M.N.'s allegations, appellant had resisted law enforcement officers in previous incidents, and they knew he was on active probation and subject to a search condition.

Officer Blum and the other officers went to appellant's house. Blum approached the front door and repeatedly knocked, but there was no response. Appellant eventually opened the solid front door but kept the outer metal screen door closed. Blum advised appellant he was under arrest and directed him to step outside. Appellant said he had to call someone to take care of his kids. Blum told appellant that he needed to come outside and could not return into his house.

Appellant walked away from the front door and went into the interior of the house, and the officers lost sight of him. Officer Ureno forced open the front screen door, entered the house, and saw appellant's two young children inside.

Appellant picked up his five-year-old child so that the child's face was against his chest. The officers repeatedly ordered appellant to put down the child. Appellant refused

6.

and said they were scaring his children. Officer Ureno believed appellant was using the child as a shield to prevent his arrest.

Officer Ureno grabbed appellant from behind and held his arms, and Officer Blum took the child. Ureno took appellant down to the floor and advised he was under arrest. Officer Lepe told appellant to place his hands behind his back, but appellant refused. Appellant was holding a cell phone against his body and appeared to be talking to someone. Ureno tried to pull appellant's left arm behind his back, but appellant resisted. There was a struggle and Ureno injured his knee.

Officer Ureno repeatedly ordered appellant to cooperate and warned that he would discharge his Taser. Appellant kept resisting, and Ureno deployed a Taser dart to appellant's back. After he was taken into custody, appellant said he did not know they were officers, but "absolutely" would not have done anything differently.

M.N. admitted that after appellant was in custody, she went to the detention center with a friend and tried to contact him. M.N. still had mixed feelings about appellant and "wanted some answers," but she did not see him.

**DEFENSE EVIDENCE**

**A.R.'s Testimony**

A.R. was called as a defense witness. She was the mother of appellant's two children, who were both under 10 years old at the time of the charged offenses. A.R. and appellant lived together for 10 years, and they separated in approximately 2023. They coparented their children and continued to be romantically involved.

A.R. and appellant started to live together again in 2023 or 2024. A.R. testified that when she returned to her home one day, there was a woman parked in front of the residence. A.R. knocked on the door of her house for appellant to let her in, but he did not answer. A.R. testified that the police eventually were called, and officers said M.N. was in the car. A.R. already suspected appellant was "cheating" on her.

7.

After that incident, M.N. got A.R.'s telephone number from appellant's cell phone, and started calling A.R. M.N. asked about A.R.'s relationship with appellant, and the two women argued. M.N. also sent text messages to A.R., called her names, and told her to leave appellant alone.

A.R. testified to an alibi for appellant for Saturday, October 12, 2024. She produced text messages on her cell phone from appellant, that he told A.R. that he was leaving work and on his way to her home. Around 8:00 p.m., appellant texted A.R. that he was there and asked where to park on the street. One of the children was sick and appellant helped with the care, and he stayed with the family the rest of the night.

A.R. described appellant as a devoted father and a peaceful man. A.R. admitted he committed acts of domestic violence against her in 2015, but she could not remember the details. A.R. said appellant matured after that incident, and everything had been fine between them.

On cross-examination, A.R. admitted that in 2015, appellant was convicted of committing acts of domestic violence against her and a restraining order was issued to prohibit contact. A.R. called the police in 2017 because he violated the restraining order and grabbed her. A.R. knew appellant had prior arrests, including an incident when he had his dog bite a homeless woman because he got upset with the victim, he tried to hide from the police, and he resisted arrest. A.R. knew that in 2021, appellant got into a bar fight while intoxicated and fought with arresting officers, and he resisted officers on other occasions. A.R. admitted that in 2023, she called the police and reported appellant was angry, shoved her against the wall, and raped her in front of one of their children.[1]

---

[1] During A.R.'s testimony, the court called a recess and excused the jury. The court advised the parties that appellant had been making contact and laughing with juror No. 10, who appeared to react. The court stated appellant had been smiling and engaging with the jurors in nonverbal ways throughout the trial. Defense counsel said he was not aware of the contact, and the court realized that. The court admonished appellant, dismissed juror No. 10, and seated an alternate.

**Appellant's Trial Testimony**

Appellant testified that as of 2023, his relationship with A.R. was "back and forth." They had some problems and split up but coparented their children together. Appellant met M.N. through social media in 2023, and they dated and had a relationship.

*September 22, 2024*

Appellant testified that on September 22, 2024, he went to the sushi restaurant and met his cousin there. They ate and drank together for an hour, and appellant had two or three sake bombs. His cousin left and appellant stayed at the restaurant. M.N. called appellant and asked what he was doing, and he said he was at the restaurant. A few minutes later, she showed up "uninvited" at the restaurant. They each had two sake bombs. About 30 minutes after M.N. arrived at the sushi restaurant, she drove him back to his house. He left his car at the restaurant because he felt he was under the influence.

Appellant testified they were not on a date. Appellant recalled there were flowers and food on the front passenger seat of M.N.'s car. When he got into M.N.'s car, he moved them to sit down and some of the food fell into the street. M.N. got angry.

Appellant testified that, as M.N. drove to his house, he received a call from A.R., but he silenced his cell phone and did not take the call. M.N. got mad and asked if the caller was his "baby mama." Appellant replied, "I think so." M.N. grabbed appellant's cell phone, threw it out the window, and kept driving. Appellant got upset and asked why she did that. She pulled over to the side of the road, and appellant got out to look for his cellphone. M.N. drove away. Appellant found his cellphone and walked to his house.

Appellant denied that he threw something and cracked M.N.'s windshield and testified it was damaged prior to that day. He denied that he sat on top of M.N. and beat her in the car, that he sat on her lap and drove her car, or that M.N. drove them to a bowling alley.

9.

*__October 12, 2024__*[2]

Appellant testified he had good and bad days during his relationship with M.N. He never touched M.N. but claimed she attacked him and once "clawed" his face. By Saturday, October 12, 2024, they were getting along again. On that day, he went to his own home after work. He then went to A.R.'s house to see his children, because one child was ill. He gave his electronic benefits transfer card to A.R., and she went out to buy food and medicine for the child. He stayed at A.R.'s house until sometime after midnight and went back to his own house for the rest of the night.

Appellant woke up the next morning between 6:00 a.m. and 7:00 a.m. He discovered M.N. was parked in front of his house and she was asleep in her car. He knocked on her car window and asked why she was there. M.N. accused appellant of just getting home and asked where he had been all night. Appellant said he had been at A.R.'s house with the children. M.N. did not believe him and became angry.

*__Appellant's Arrest__*

Appellant testified that M.N. called him on October 15, 2024, and told him to watch out and he "better have [his] bail money ready." M.N. said she had seen appellant with A.R. and accused him of being back together with that "b[****]."

About six hours after M.N.'s call, the police arrived at appellant's house. Appellant denied that he tried to delay, resist, or escape from the officers. Appellant's children were at the house because he had picked them up from school that day.

Appellant acknowledged the officers identified themselves as the police, but testified his neighborhood was "fishy," and he thought they might be suspects trying to

---

**2**     Just before appellant's direct examination testimony about the October 12, 2024, incident, the court held a hearing with both parties outside the jury's presence. Defense counsel stated that appellant was testifying against his advice. Defense counsel further stated that based on the nature of appellant's expected testimony about the events of October 12, 2024, appellant should be permitted to testify in a narrative form. The prosecutor did not object, and the court granted defense counsel's motion.

commit a home invasion burglary. He turned on his front porch light and it appeared they could be police officers. Appellant put his dog in the bedroom since the dog was very protective.

Appellant opened the front door but not the outer screen door. He saw a lot of police officers, he became confused, and he panicked. He turned to go into the kitchen to get his phone because he wanted to call A.R. to get their children. The police forcibly entered the house, and one child freaked out. Appellant picked up the child and testified that he had the right to protect his children. He did not hear the officers' commands to put down the child because everyone was yelling and his dog was barking. Appellant did not try to hurt the officers.

Appellant acknowledged that after he was arrested, an officer asked if he had been with M.N. on Saturday and he said yes. Appellant testified he was not sure which Saturday the officer meant and did not realize the officer was asking about Saturday, October 12, 2024. Appellant testified he never assaulted or hit M.N. He did not inflict the bruises and injuries on her body, and he did not know how she got them.

Appellant testified that when he was in jail, M.N.'s friend visited him in custody and showed him a note from M.N. In the note, M.N. asked appellant to call her from jail if he could.

### *Impeachment of Appellant*

Appellant acknowledged he was on felony and misdemeanor probation when he was arrested in this case but claimed not to know that he was subject to a search condition.

Appellant admitted that he was alleged to have grabbed A.R. by her hair and dragged and punched her in 2014; he was convicted of domestic violence and false imprisonment in 2015. A couple of months after that conviction, he was arrested again and alleged to have strangled A.R. in the presence of their three-week-old child; he pleaded to misdemeanor domestic violence in October 2015.

11.

Appellant admitted he was involved in a bar fight in 2021, but claimed he acted in self-defense against another patron; he was charged with misdemeanor battery on an officer.

Appellant was asked about an incident in 2021 when he was driving under the influence, crashed into another car, injured two people, fled, and lied about his name when he was arrested; appellant testified he was so drunk he could not remember what happened.

He denied that he had his dog attack a homeless woman. Appellant said that in 2023, there was an incident where a dog bit a homeless man outside the barbershop that defendant owned and operated. Appellant testified he had nothing to do with that incident and denied that his dog attacked anyone. Appellant admitted he was charged with assault in that case and the charges were dropped.

Appellant admitted he had multiple arrests and convictions for driving under the influence and resisting arrest. Appellant claimed A.R. lied when she testified that he raped her in their child's presence.

## PROCEDURAL BACKGROUND

### Convictions

On May 20, 2025, after a jury trial, appellant was found guilty as charged of the following offenses as alleged in the first amended information:

Count 2: misdemeanor vandalism of property belonging to M.N. worth less than $400, on or about September 22, 2024 (§ 594, subd. (b)(2)(A));

Count 3: felony willful and unlawful infliction of a corporal injury resulting in a traumatic condition on M.N., on or about October 12, 2024 (§ 273.5, subd. (a));

Count 5: felony assault likely to produce great bodily injury on M.N., on or about October 12, 2024 (§ 245, subd. (a)(4));

Count 8: felony child endangerment of his five-year-old child, on or about October 15, 2024 (§ 273a, subd. (a));

12.

Count 9: felony resisting an executive officer, on or about October 15, 2024 (§ 69); and

Count 10: misdemeanor resisting arrest, on or about October 15, 2024 (§ 148, subd. (a)(1)). (CT 282, 286, 290-292; RT 502-503, 504)

Appellant was found not guilty of the charged offense in count 1, felony willful and unlawful infliction of a corporal injury resulting in a traumatic condition (§ 273.5, subd. (a)); but guilty of the lesser included offense of misdemeanor battery on M.N., on or about September 22, 2024 (§ 243, subd. (e)(1)).

Appellant was found not guilty of the charged offense in count 7, felony criminal threats (§ 422, subd. (a)); but guilty of the lesser included offense of felony attempted criminal threats to M.N., on or about October 12, 2024 (§§ 644, 422, subd. (a)).

Appellant was found not guilty of two counts based on the October 12, 2024, incident: Count 4, false imprisonment of M.N. (§ 236); and count 6, attempting to prevent M.N. from reporting or giving information about a crime (§ 136.1, subd. (b)(1)).

The court found several aggravating factors were true. (Cal. Rules of Court, rule 4.421(b)(1), (2), (4), (5)).

**Sentencing**

On September 24, 2025, appellant was sentenced to an aggregate term of eight years four months for both case No. CR-24-013167, and the unrelated case No. CR-23-002137 where probation in a prior case was revoked.

In this case No. CR-24-013167, the court imposed the upper term of six years for count 8, child endangerment; with consecutive sentences of one year (one-third the midterm) for count 3, willful and unlawful infliction of a corporal injury resulting in a traumatic condition on M.N. (§ 273.5, subd. (a)), and eight months (one-third the midterm) for count 9, resisting an executive officer (§ 69). In case No. CR-23-002137, the court revoked probation and imposed a consecutive term of eight months (one-third

13.

the midterm) for count 1, driving under the influence proximately causing bodily injury § 23135, subd. (a)).

On September 24, 2025, appellant filed a timely notice of appeal.[3]

## **DISCUSSION**

As noted above, appellate counsel filed a *Wende* brief with this court. The brief also includes counsel's declaration that appellant was advised he could file his own brief with this court. On March 25, 2026, this court advised appellant by letter that he could file a supplemental letter or brief raising any arguable issues. Appellant did not do so.

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed.

---

**3** On February 17, 2026, during the pendency of this appeal, appellate counsel moved for the trial court to correct the calculation of appellant's presentence credits and filed an amended minute order and abstract of judgment. On March 20, 2026, the trial court filed an amended minute order and abstract of judgment that corrected appellant's credits.